JACOB PANKAU

*v.*

DANIEL MORRISSEY.

*Opinion filed December 22, 1906.*

1. DEEDS—*when decree dismissing bill to cancel a deed must be sustained.* A decree dismissing, for want of equity, a bill to cancel a deed made by complainant and his wife upon the ground that they did not understand it was a deed, must be sustained, where the weight of the evidence shows that the deed was executed to protect the grantee, who had previously purchased the land at a trustee's sale, in taking up a second mortgage which was being foreclosed on the land, and that the grantor then accepted a lease upon the property and continued in the relation of tenant without controversy for over twenty years.

2. SAME—*what tends to show that grantor regarded grantee as the owner of the land.* Proof that after the execution of a deed the grantor accepted a lease from the grantee and paid him rent, without objection, for over twenty years, during which time the grantee kept up the farm and on one occasion re-built at his own expense the dwelling house, which had burned, sufficiently establishes that the grantor regarded the grantee as the owner of the land and himself as a tenant, only.

WRIT OF ERROR to the Circuit Court of Champaign county; the Hon. SOLON PHILBRICK, Judge, presiding.

This was a bill by plaintiff in error, against defendant in error, to set aside a deed executed by the former and his wife to the latter, and for an accounting. The cause was heard in the circuit court of Champaign county on the bill, answer, replication and proofs reported by the master and a decree rendered dismissing the bill for want of equity, at the complainant's costs. To reverse that decree this writ of error has been sued out.

The allegation of the bill is, that on May 11, 1875, the complainant purchased the one hundred and seventy acres therein described of one Sanford Richards, subject to an

indebtedness of $3000, evidenced by a promissory note secured by a trust deed on the premises; that default being made in the payment of an installment of interest on that indebtedness, the lands were advertised to be sold on June 11, 1879, under a power in the trust deed; that a neighbor of complainant proposed to exchange eighty acres of unencumbered land for his equity in the one hundred and seventy acres, which offer he was about to accept when the defendant proposed to protect him in his rights to the land "by purchasing said indebtedness, stopping the sale and giving complainant the privilege of paying the indebtedness to him, with interest at ten per cent, when he obtained the money, whereupon he would release the land and surrender said note." It is then alleged that complainant, having full confidence in the defendant and implicitly relying upon the good faith of his offer, accepted the same; that the complainant is a German, uneducated in the English language, and that because of said contract the defendant took the land and now holds the same as trustee for him, the complainant; that afterwards the defendant and one William A. Day, his attorney, stated to the complainant that he (Morrissey) had bought said note but had made ample provision to protect the complainant in his rights to the land; that in order to secure the re-payment of the money paid out by Morrissey complainant and his wife should sign a certain paper then produced, and that both he and his wife, being ignorant of the English language and unable to read such paper, signed and executed the same upon the representation of Morrissey that it was a contract providing that complainant should deliver to him the surplus grain raised on the lands each year, out of which he (Morrissey) would pay the taxes and apply the balance to the payment of said indebtedness until the same, with interest, should be fully paid, whereupon he would release the land and surrender up said note; that it was not until recently, prior to the bringing of this suit, that he learned that the paper so executed was a quit-claim deed

to said premises; that as a deed the same was without consideration, obtained through fraud and was and is void. The bill then alleged that the complainant for five years delivered to the defendant practically all the grain raised on the said lands, amounting to $1000 per annum, and has since delivered to him the surplus raised thereon, by means whereof he has long since discharged said indebtedness to the defendant, but no accounting has ever been made to him or offered by the defendant; that the defendant now claims title to the said lands both by virtue of a deed from the trustee under said trust deed and by the said quit-claim deed, and threatens to oust and dispossess the complainant.

The answer avers that the defendant purchased the said lands at the trustee's sale on June 11, 1879, for the sum of $3500 and received a trustee's deed therefor, which he filed for record on the next day and that the same was thereupon duly recorded; that he has owned the land ever since,—a period of about twenty-five years.

The transaction resulting in the giving of the quit-claim deed mentioned in the bill is explained by defendant as follows: After the sale by the trustee one Jesse M. Richards commenced an action of foreclosure against the lands upon a mortgage executed by the complainant to Sanford Richards, from whom the complainant purchased, as stated in his bill. To that foreclosure proceeding the complainant and his wife, the trustee and the person for whose use the trust deed was executed, together with the defendant, Daniel Morrissey, were defendants. That mortgage was executed to secure about $200 indebtedness which was due and owing by the complainant, Jacob Pankau, and under the advice of his attorney Morrissey decided to pay the same provided Pankau and wife would execute to him a quit-claim deed to the land, conveying any right, title or interest which they might have in the premises, and that on September 17, 1879, said deed, in pursuance of that understanding, was executed and delivered, and duly filed for record in the office

of the recorder of Champaign county on September 19 following. At the same time the quit-claim deed was delivered the complainant also executed to Morrissey a lease for the lands, since which time the relation of landlord and tenant has existed between the parties.

D. W. THOMPSON, JOHN J. REA, and RAY & DOBBINS, for plaintiff in error.

MANFORD SAVAGE, (GEORGE W. GERE, of counsel,) for defendant in error.

Mr. JUSTICE WILKIN delivered the opinion of the court:

It will be seen from the foregoing statement of the issues made by the bill and answer, that the questions here involved are of fact rather than of law. There is a material variance between the allegations of the bill and the testimony of the complainant as to the agreement claimed to have been made between the parties. The bill alleges that Morrissey promised to purchase the indebtedness secured by the trust deed and allow Pankau to re-pay him when he (Pankau) became able, and all Morrissey would ask of him would be the principal sum of $3000 and interest thereon at ten per cent per annum, and when the debt was fully paid and discharged he, the said Morrissey, would release the trust deed and deliver to said Pankau the $3000 note. But Pankau himself testified that upon being informed that the land was advertised for sale he went to Morrissey, who said he would bid it in for him and when he got ready he could get it back. His language is: "Morrissey said he would buy it in for me. It was sold in the court house. I was there. I went with Mr. Morrissey. I understood he went to buy the place for me. He said he did not need the money and that he did not want the land. He said, 'I want the interest on my money.' Mr. Morrissey bid on the land and

bought it. He bid it in for $3500." The evidence therefore wholly fails to support the bill.

But aside from the question of variance, the clear preponderance of the testimony is against the claim of the complainant that there was an agreement or understanding between himself and Morrissey as to the purchase of the premises by the latter. Even conceding that the complainant himself testified to such an agreement and that he was to some extent corroborated by his sons, who testified to conversations with Morrissey to the effect that he did not want the land but intended their father to have it upon the re-payment to him of the money which he had invested in it, that testimony is overcome by the facts and circumstances shown in evidence on behalf of the defendant. It will be conceded that the burden of proof was upon the complainant to make out his case by a preponderance of the testimony. The documentary evidence in the record goes very far to disprove the allegations of the bill and establish the averments of the answer. The trustee's deed of June 11, 1879, conveyed the property to the defendant in consideration of $3500, and it is fully established that the amount of the bid was paid by the defendant to the trustee. That deed was duly recorded on the day following the sale. The quit-claim deed, made shortly afterward, regular upon its face, was duly acknowledged and recorded in the recorder's office of the county a day or two after it was executed. At the same time the complainant executed a lease to the defendant, by the terms of which he became a tenant, agreeing to pay certain rents for the use of the premises. It is true, the complainant says he did not understand that he was executing the quit-claim deed, and, as we understand his testimony, claims that the lease was made for the purpose of defeating his creditors; but the testimony of the defendant and that of William A. Day, who took the acknowledgment of the quit-claim deed and prepared the lease and was present when it was executed, is positive and to the effect that both transactions

were entered into with a full understanding on the part of the complainant and without any fraudulent representations on the part of Morrissey or his attorney. These two witnesses also fully sustain the theory of the answer that the quit-claim deed was made in settlement of the foreclosure suit begun by the said Jesse M. Richards.

The uncontradicted proof of the complainant's conduct from the time of the execution of the lease to the bringing of this suit can be explained only upon the theory that he understood that he occupied the premises as the tenant of the defendant. Thus, Mr. B. C. Beech, a grain dealer in the city of Champaign, speaking of the farm in question, said: "I know the place. I bought grain from it for more than fifteen years. Pankau and son delivered the grain to my elevator. My custom was to confer with both Pankau and Morrissey before purchasing the grain raised on the farm. Part of the money for the grain was paid to Pankau and part to Morrissey. Prior to 1899 two-thirds went to Pankau and one-third to Morrissey; subsequent to 1899 three-fifths to Pankau and two-fifths to Morrissey. I have been on this farm several times, and Pankau showed me which crib of grain was his and which crib belonged to Morrissey. I always settled with Morrissey and Pankau on the basis aforesaid. Morrissey received two-fifths share of the oats of last year's crop. About the time of the last season's delivery of the oats from this farm from the machine, they (the Pankaus) said they did not want the oats sold as the matter was in controversy and that they were making some claims on Morrissey. They claimed a conveyance, from what Pankau said, and that there was a controversy, and that they (the Pankaus) did not want the oats sold and settled for until this matter was settled. Subsequently they (the Pankaus) came in and sold more oats and directed me to settle the same way as heretofore." The evidence also clearly shows that the farm was kept up, during the running of the lease, by Morrissey. When the dwelling house was destroyed

by fire, about February, 1904, Morrissey re-built it, and paid for material used in making other repairs upon the premises.

It can scarcely be conceived, under the facts and circumstances shown by this record, that a man of even inferior intelligence and ignorant of the English language could have remained oblivious to the fact that he was holding the land as a tenant and not as the owner. He may have indulged the hope that he would be allowed to re-purchase the land, but if he did so, on the evidence in this record it was without any contract or agreement which could be enforced. The land, at the time of the trustee's sale, as shown by the evidence, was worth but little more than the amount of the indebtedness. Although the consideration stated in the deed from Richards to the complainant is $8000, the complainant himself fixed the value at that time at $40 an acre, and several of the witnesses say it was not worth to exceed $20 or $25 per acre. Its present value of $140 per acre has been the result of the general increase in the value of farm lands in that vicinity and also of the improvements placed thereon by the defendant. If, therefore, either of the parties can be said to have changed his attitude toward the property on account of its increased value, it would be the complainant, and not the defendant.

Our examination and consideration of the entire record has led us to the conclusion that the chancellor has properly decided the case, and that no other decree could have been reasonably pronounced without disregarding the weight of the testimony in the record:

The decree of the circuit court of Champaign county will therefore be affirmed.               *Decree affirmed.*